**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

CODY T. DENNISON,                                    :

      Plaintiff,                                   :

vs.                                                  :          CA 18-0532-MU

ANDREW M. SAUL,                                      :
Commissioner of Social Security,
                                                     :
      Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

     Plaintiff Cody T. Dennison brings this action, pursuant to 42 U.S.C. § 1383(c)(3),

seeking judicial review of a final decision of the Commissioner of Social Security denying

his claim for supplemental security income benefits. The parties have consented to the

exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all

proceedings in this Court. (Docs. 14 & 15 ("In accordance with provisions of 28 U.S.C.

§636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States

magistrate judge conduct any and all proceedings in this case, . . . order the entry of a

final judgment, and conduct all post-judgment proceedings.")). Upon consideration of the

administrative record, Plaintiff's brief, and the Commissioner's brief,[1] the Court concludes

that the Commissioner's decision denying benefits should be affirmed.[2]

_____

[1]     The parties waived oral argument. (Doc. 12; *see also* Doc. 13 (order granting motion to waive oral argument)).

[2]     Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 14 & 15 ("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court.")).

# I. Procedural Background

Plaintiff protectively filed an application for supplemental security income benefits, on or about March 29, 2016, alleging disability beginning on April 28, 2011. (*See* Tr. 131-39.) Dennison's claim was initially denied on May 25, 2016 (Tr. 68 & 71-76) and, following Plaintiff's June 16, 2016 written request for a hearing before an Administrative Law Judge ("ALJ") (*see* Tr. 80-82), a hearing was conducted before an ALJ on November 29, 2017 (Tr. 30-54). On April 28, 2018, the ALJ issued a decision finding that the claimant was not disabled and, therefore, not entitled to SSI benefits. (Tr. 15-23). More specifically, the ALJ determined that Dennison retains the residual functional capacity to perform a full range of work at all exertional levels, with certain identified nonexertional limitations, and can perform those medium and light jobs identified by the vocational expert ("VE") during the administrative hearing (*compare id.* at 19 & 22 *with* Tr. 50-51). On May 29, 2018, the Plaintiff filed a written request for review of the ALJ's unfavorable decision (Tr. 130) and, on November 8, 2018, the Appeals Council denied Dennison's request for review (Tr. 1-3). Thus, the hearing decision became the final decision of the Commissioner of Social Security.

Plaintiff alleges disability due to autism spectrum disorder and adjustment disorder. The Administrative Law Judge (ALJ) made the following relevant findings:

> **2.      The claimant has the following severe impairments: autism spectrum disorder and adjustment disorder (20 CFR 416.920(c)).**
>
> .      .      .
>
> **3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

.  .  .

**4.**     **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple, routine tasks in 2-hour increments with normal breaks for the duration of an 8-hour workday. The claimant can tolerate occasional change in a routine work setting. The claimant should have no direct interaction with the public and occasional interaction with supervisors and coworkers. The claimant can work in close proximity to others, but he must work independently, not in a team.**

.  .  .

**5.**     **The claimant has no past relevant work (20 CFR 416.965).**

**6.**     **The claimant was born on April 28, 1993, and was 22 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).**

**7.**     **The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).**

**8.**     **Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).**

**9.**     **Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).**

.  .  .

**10.**     **The claimant has not been under a disability, as defined in the Social Security Act, since March 2, 2016, the date the application was filed (20 CFR 416.920(g)).**

(Tr. 17, 19, 21 & 22 (emphasis in original)).

## II. Standard of Review and Claim on Appeal

A claimant is entitled to an award of supplemental security income benefits when he is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or last for a continuous period of not less than 12 months. *See* 20 C.F.R. § 416.905(a). In determining whether a claimant has met his burden of proving disability, the Commissioner follows a five-step sequential evaluation process. *See* 20 C.F.R. § 416.920. At step one, if a claimant is performing substantial gainful activity, he is not disabled. 20 C.F.R. § 416.920(b). At the second step, if a claimant does not have an impairment or combination of impairments that significantly limits his physical or mental ability to do basic work activities (that is, a severe impairment), he is not disabled. 20 C.F.R. § 416.920(c). At step three, if a claimant proves that his impairments meet or medically equal one of the listed impairments set forth in Appendix 1 to Subpart P of Part 404, the claimant will be considered disabled without consideration of age, education and work experience. 20 C.F.R. § 416.920(d). At the fourth step, if the claimant is unable to prove the existence of a listed impairment, he must prove that his physical and/or mental impairments prevent him from performing any past relevant work. 20 C.F.R. § 416.920(f). And at the fifth step, the Commissioner must consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. 20 C.F.R. § 416.920(g). Plaintiff bears the burden of proof through the first four steps of the sequential evaluation process, *see Bowen v. Yuckert,* 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5, 96 L.Ed.2d 119 (1987), and while the burden of proof shifts to the Commissioner at the fifth step of the

process to establish other jobs existing in substantial numbers in the national economy that the claimant can perform,[3] the ultimate burden of proving disability never shifts from the plaintiff, *see, e.g., Green v. Social Security Administration,* 223 Fed.Appx. 915, 923 (11th Cir. May 2, 2007) ("If a claimant proves that she is unable to perform her past relevant work, in the fifth step, 'the burden shifts to the Commissioner to determine if there is other work available in significant numbers in the national economy that the claimant is able to perform.' . . . Should the Commissioner 'demonstrate that there are jobs the claimant can perform, the claimant must prove she is unable to perform those jobs in order to be found disabled.'").[4]

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[5] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. Appx.

---

[3]     *See, e.g., McManus v. Barnhart,* 2004 WL 3316303, *2 (M.D. Fla. Dec. 14, 2004) ("The burden [] temporarily shifts to the Commissioner to demonstrate that 'other work' which the claimant can perform currently exists in the national economy.").

[4]     "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

[5]     This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

995, 996 (11th Cir. Apr. 1, 2010) (per curiam), citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). And, "[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence." *Id.*, citing *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004).

On appeal to this Court, Dennison asserts that the Commissioner's decision denying him benefits is not supported by substantial evidence and, indeed, is contradicted by all the opinion evidence in the record. In particular, Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence because the ALJ cherry-picked evidence showing moderate limitations, while dismissing multiple opinions showing Plaintiff has marked limitations in more than one area of functioning. And, according to Plaintiff, the ALJ cites to no evidence which explicitly supports her rejection of the opinions of Dr. John W. Davis and Robin Wood, LPC-S, NCC, RPT-S.

The responsibility for making the residual functional capacity determination rests with the ALJ. *Compare* 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.") *with, e.g., Packer v. Commissioner, Social Security Admin.*, 542 Fed. Appx. 890, 891-892 (11th Cir. Oct. 29, 2013) (per curiam) ("An RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. There is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." (internal

citation omitted)). A plaintiff's RFC—which "includes physical abilities, such as sitting, standing or walking, and mental abilities, such as the ability to understand, remember and carry out instructions or to respond appropriately to supervision, co-workers and work pressure[]"—"is a[n] [] assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." *Watkins v. Commissioner of Social Security,* 457 Fed. Appx. 868, 870 n.5 (11th Cir. Feb. 9, 2012) (citing 20 C.F.R. §§ 404.1545(a)-(c), 416.945(a)-(c)); *see also Davison, supra,* 370 Fed.Appx. at 996 ("An ALJ makes an RFC determination by considering the claimant's ability to sit, stand, walk, lift, carry, push, pull, stoop, crouch, and reach."); 20 C.F.R. § 404.1545(a)(3) (in assessing RFC, the Commissioner is required to consider "descriptions and observations of [the claimant's] limitations from [] impairments, including limitations that result from [] symptoms, such as pain, provided by [the claimant] . . . .").

To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has "'provide[d] a sufficient rationale to link'" substantial record evidence "'to the legal conclusions reached.'" *Ricks v. Astrue*, 2012 WL 1020428, *9 (M.D. Fla. Mar. 27, 2012) (quoting *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005)); *compare id. with Packer v. Astrue*, 2013 WL 593497, *4 (S.D. Ala. Feb. 14, 2013) ("'[T]he ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work.'"), *aff'd,* 542 Fed. Appx. 890 (11th Cir. Oct. 29, 2013); *see also Hanna v. Astrue*, 395 Fed. Appx. 634, 636 (11th Cir. Sept. 9, 2010) (per curiam) ("The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful

review. . . . Absent such explanation, it is unclear whether substantial evidence supported the ALJ's findings; and the decision does not provide a meaningful basis upon which we can review [a plaintiff's] case." (internal citation omitted)).[6] However, in order to find the ALJ's RFC assessment supported by substantial evidence, it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician. *See, e.g., Packer, supra,* 2013 WL 593497, at *3 ("[N]umerous court have upheld ALJs' RFC determinations notwithstanding the absence of an assessment performed by an examining or treating physician."); *McMillian v. Astrue*, 2012 WL 1565624, *4 n.5 (S.D. Ala. May 1, 2012) (noting that decisions of this Court "in which a matter is remanded to the Commissioner because the ALJ's RFC determination was not supported by substantial and tangible evidence still accurately reflect the view of this Court, but not to the extent that such decisions are interpreted to require that substantial and tangible evidence must—in all cases—include an RFC or PCE from a physician"

---

[6]     It is the ALJ's (or, in some cases, the Appeals Council's) responsibility, not the responsibility of the Commissioner's counsel on appeal to this Court, to "state with clarity" the grounds for an RFC determination. Stated differently, "linkage" may not be manufactured speculatively by the Commissioner—using "the record as a whole"—on appeal, but rather, must be clearly set forth in the Commissioner's decision.  *See, e.g., Durham v. Astrue*, 2010 WL 3825617, *3 (M.D. Ala. Sept. 24, 2010) (rejecting the Commissioner's request to affirm an ALJ's decision because, according to the Commissioner, overall, the decision was "adequately explained and supported by substantial evidence in the record"; holding that affirming that decision would require that the court "ignor[e] what the law requires of the ALJ[; t]he court 'must reverse [the ALJ's decision] when the ALJ has failed to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted'" (quoting *Hanna*, 395 Fed. Appx. at 636 (internal quotation marks omitted))); *see also id.* at *3 n.4 ("In his brief, the Commissioner sets forth the evidence on which the ALJ could have relied . . . . There may very well be ample reason, supported by the record, for [the ALJ's ultimate conclusion].  However, because the ALJ did not state his reasons, the court cannot evaluate them for substantial evidentiary support.  Here, the court does not hold that the ALJ's ultimate conclusion is unsupportable on the present record; the court holds only that the ALJ did not conduct the analysis that the law requires him to conduct." (emphasis in original)); *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons he gave.").

(internal punctuation altered and citation omitted)); *but cf. Coleman v. Barnhart,* 264 F.Supp.2d 1007 (S.D. Ala. 2003).

In this case, the Court finds that the ALJ linked her RFC assessment—that is, work at all exertional levels with some mental limitations—to specific evidence in the record bearing upon Dennison's ability to perform the physical, mental, sensory and other requirements of work. (*Compare* Tr. 19-21 *with generally* Tr. 34-50, 59-65, 146-55, 169-85, 225-43, 247-51 & 259-76.) In particular, even though the Plaintiff argues that the ALJ erred in failing to accord appropriate weight to the opinions of consultative examiner Dr. John W. Davis and Counselor Robin Wood, and, instead, improperly cherry-picked from the evidence of record to "reach" her RFC assessment, this Court does not agree and finds the ALJ's RFC assessment supported by substantial evidence.[7]

Before addressing the Plaintiff's specific arguments, the undersigned notes that "[w]eighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of the process for determining disability." *Kahle v. Commissioner of Social Security,* 845 F.Supp.2d 1262, 1271 (M.D. Fla. 2012). In general, "the opinions of examining physicians are given more weight than those of non-examining

_____

[7]    To the extent that the Defendant is correct in reading Plaintiff's brief to raise a second claim directed to the "B criteria" and the ALJ's determination that Plaintiff has only moderate limitations with respect to the "B criteria" (*compare* Doc. 11, at 7-9 (Defendant's argument) *with* Doc. 10, at 4 ("The ALJ's decision summarizes the same evidence [as Plaintiff had just summarized in the earlier portion of his brief], yet concludes, inexplicably, that Plaintiff has only moderate limitations in the B criteria. She states, 'in sum, the above residual functional capacity assessment is supported by the evidence described above.'")), the Court simply finds, for the reasons stated in the Defendant's brief (Doc. 11, at 7-9), that the ALJ's "B criteria" analysis is supported by substantial evidence. The Court would note that the ALJ's "B criteria" analysis was performed in conjunction with steps 2 and 3 of the five-step sequential process (*see* Tr. 19) and, in performing that analysis, the ALJ pointed to specific evidence in the record in support of her moderate limitation findings (Tr. 18), evidence which this Court finds to be "substantial" support for those "moderate" limitation findings.

physicians, treating physicians are given more weight than those of physicians who examine but do not treat, and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." *McNamee v. Social Sec. Admin.,* 164 Fed.Appx. 919, 923 (11th Cir. Jan. 31, 2006). Indeed, "the ALJ must give the opinion of the treating physician 'substantial or considerable weight unless "good cause" is shown to the contrary.'" *Williams v. Astrue,* 2014 WL 185258, *6 (N.D. Ala. Jan. 15, 2014), quoting *Phillips, supra,* 357 F.3d at 1240 (other citation omitted); *see Nyberg v. Commissioner of Social Security,* 179 Fed.Appx. 589, 591 (11th Cir. May 2, 2006) (citing to same language from *Crawford v. Commissioner of Social Security,* 363 F.3d 1155, 1159 (11th Cir. 2004)).

> Good cause is shown when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). Where the ALJ articulate[s] specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. *Moore* [*v. Barnhart*], 405 F.3d [1208,] 1212 [(11th Cir. 2005)].

*Gilabert v. Commissioner of Social Sec.*, 396 Fed.Appx. 652, 655 (11th Cir. Sept. 21, 2010) (per curiam).

Dr. John W. Davis, a clinical psychologist, consultatively examined Dennison on May 19, 2015. (Tr. 247-51.) Mental status examination/observations revealed the following: (1) Dennison's general appearance and behavior were essentially normal/satisfactory, with specific notation being made that he had no unusual mannerisms, tics or gestures or unusual prominent characteristics; his appearance, dress, grooming and hygiene were satisfactory and casual; and interaction with the clinic staff and the examiner was satisfactory; (2) he showed no abnormalities that would

interfere with communication and, indeed, normal communication was established; (3) he did have blunted mood and expression; (4) he was oriented to person, place and time; he was able to handle serial 7's without difficulty, make change and do simple arithmetic, count backwards from 20 to 1 without difficulty, spell "world" backward, and there were no indications of deficits in his overall concentration or attention; his immediate, recent and remote memory were adequate (for instance, he could recall 2 of 3 objects in one minute and 2 of 3 objects in 5 minutes, he could describe his activities of "recent" successive days without difficulty, and he could remember the date of Christmas and details about his previous employment); his fund of information was adequate (for instance, he could name the President, but not the Governor and Mayor, and that there were 52 weeks in a year); abstract thinking was normal (for instance, he could see similarities between paired objects and he could interpret proverbs); thought processes were normal, as there was no confusion, loose associations, tangential or circumstantial thinking; as for thought content, there were no indications of hallucinations or delusion, no homicidal or suicidal ideation, no preoccupations, obsessions, phobias, ruminations, or somatization, but there were feelings of detachment form his environment and he did show depersonalization, doubting, indecision, unworthiness, and helplessness ideations; judgment and insight were fair; and he was reported as having normal relationships with his family and peers. (Tr. 248-49.) Dennison's reported activities of daily living included residing with his mom, spending his day looking after his dogs and working on a book, engaging in several hobbies (reading, writing, playing games), helping with the cooking and cleaning, and having no difficulties with personal hygiene. (*Id.* at 249-50.) Intelligence testing, which was determined to be reliable and valid (*see id.* at 250 ("Rapport was

established and maintained. The claimant cooperated with the examiner, appearing friendly as well as comfortable in the test setting. Verbal expression was understandable for the purpose of testing. Attention was adequate as the claimant appeared to give some thought to ideas before responding. There were no visual, hearing, or other physical problems, nor recent or prior exposure to testing that could have affected the results. The test results are consistent with the claimant's education, vocational background, and social judgment, especially in the area of self-sufficiency.")), revealed a Full Scale IQ of 93, placing Dennison in the average range of intellectual functioning. (*Id.*) In a separate paragraph designated "Personality," Dr. Davis noted that Dennison was showing and/or reporting the following symptoms relative to the autism spectrum: deficits in social and communication skills and in social reciprocity; difficulty in sustaining attention and adapting to change; and problems concentrating. (*Id.*)

Dr. Davis' diagnostic impression was Autism Spectrum Disorder and the clinical psychologist's prognosis was guarded. (*Id.* at 251 ("It is unlikely to change within the next six to twelve months because limitations are related to poor social skills and his dependency.")). Dr. Davis conclude his examination with the following comments:

> The claimant's ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions is good.
>
> The claimant's ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions is poor.
>
> The claimant's ability to interact appropriately with the public, interact appropriately with supervisors and co-workers[,] and to respond appropriately to usual work situations and to changes in routine setting is poor.

(*Id.*)

On October 17, 2017, Licensed Professional Counselor Robin Wood completed a mental residual functional capacity questionnaire and thereon indicated that Dennison has moderate impairment[8] with respect to understanding, remembering and applying information and in adapting or managing himself; marked impairment[9] with respect to interacting with others and regarding estimated deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely and appropriate manner; and the claimant would be expected to have repeated (that is, 3) episodes of decompensation in work or work-like settings causing him to withdraw from the situation or experience exacerbation of signs and symptoms for a period lasting at least two weeks. (Tr. 279.) As a result of the foregoing "mental status" evaluation of Dennison, Wood opined that Dennison would experience the following limitations in a routine work setting: a mild limitation in understanding, carrying out, and remembering instructions; moderate limitations in responding appropriately to supervision and co-workers and in performing repetitive tasks; no limitation in performing simple tasks; and marked limitations in responding appropriately to customary work pressures and completing work-related activities in a normal workday or workweek. (*Id.* at 279-80.) On the same date that Wood completed the mental RFC questionnaire, she also conducted a psychotherapy session with Dennison (*see* Tr. 259). This was the last of 13 psychotherapy sessions Wood had with Dennison, the first being conducted on May 23, 2017, when Wood diagnosed

---

[8]     The form Wood completed defined "moderate" as "[a]n impairment which affects is (sic) fair but does not preclude ability to function independently, appropriately, effectively and on a sustained basis." (Tr. 279.)

[9]     The form describes "marked" as "[a]n impairment which seriously affects ability to function independently, appropriately, effectively and on a sustained basis; 'marked' is more than 'moderate' but less than 'extreme.'" (Tr. 279.)

Dennison with an adjustment disorder (*see, e.g.,* Tr. 276). These therapy sessions reveal the following mental status findings by Wood: (1) on May 23, 2017, Dennison's general appearance and dress were appropriate, motor activity was unremarkable, insight and judgment were good, affect was flat, mood was anxious, he was oriented to person, place and time, memory was intact, attention and concentration were good, thought content was appropriate, perception and flow of thought was unremarkable, interview behavior was appropriate, and speech was stuttering (Tr. 275); (2) on June 13, 2017, Dennison was oriented and alert, his mood was euthymic, his functional status was intact, his affect was appropriate, and he was interactive, the examiner noting his progress was "maintained" (Tr. 273);[10] (3) on June 22, 2017, the claimant was oriented and alert, his mood was depressed and anxious, his functional status was intact, his affect was appropriate, and he was interactive, Wood noting his progress was "maintained" (Tr. 272); (4) on June 27, 2017, Dennison was oriented and alert, his mood was depressed, his functional status was intact, his affect appropriate, and he was interactive, with his progress again noted as "maintained" (Tr. 271);[11] (5) on July 11, 2017, the claimant was alert and oriented, his mood was depressed and anxious, his functional status was variably impaired, his affect was appropriate, and he was interactive, the examiner again

---

[10]    Wood noted during this session that Dennison was doing well and that he expressed that he wanted to get a job to contribute to his life and to society. (*Id.*)

[11]    Wood observed that Dennison was "loosening up more and more after each visit[,]" but also that he started "crying again as he wants so bad to help his mother an[d] get a job." (*Id.*)

(Continued)

noting his progress was "maintained" (Tr. 269);[12] (6) on July 25, 2017, Dennison was oriented and alert, his mood was anxious, his functional status intact, his affect appropriate, and he was interactive, the examiner once again noting his progress was "maintained" (Tr. 268);[13] (7) on August 1, 2017, Dennison was alert and oriented, his mood was euthymic, his functional status intact, his affect appropriate, and he was interactive, the examiner noting for the first time that his progress was "progressing" (Tr. 267);[14] (8) on August 8, 2017, Dennison was alert and oriented, his mood euthymic, his functional status intact, his affect appropriate, and he was interactive, the examiner once again noting that his progress was "progressing" (Tr. 265); (9) on August 15, 2017, the claimant was alert and oriented, his mood euthymic, his functional status intact, his affect appropriate, and he was interactive, the examiner once again noting that his progress was "progressing" (Tr. 263); (10) on August 22, 2017, Dennison was alert and oriented, his mood euthymic, his functional status intact, his affect appropriate, and he was interactive, the examiner noting that his progress was "maintained" (Tr. 262);[15] (11) on

---

[12]    The examiner noted that Dennison "started out really well holding eye contact[,]" reported doing well while his mother was in Washington because she left everything prepared for him ("food to laundry"), but that he started to cry when talking about his dog that died. (*Id.*)

[13]    Wood noted that Dennison was "frazzled" because his four-year-old niece was at the house and "[h]e doesn't handle a lot of noise well." (*Id.*) The counselor also noted Dennison's report that he stayed at home alone while his mother was on a trip, although he did not venture far from home and his sister checked on him. (*Id.*)

[14]    The examiner noted Dennison was doing better and making more eye contact. (*Id.*) The claimant also reported that he wanted to get out more and would like "to meet a girl to hang out with." (*Id.*)

[15]    There is absolutely nothing in this progress note indicative of any "worsening" or "backsliding" of Dennison's adjustment disorder (*see id.*); therefore, it is logical to conclude that Wood meant to indicate that the claimant was "maintaining" his "progress." (*See id.*)

(Continued)

August 29, 2017, Dennison was alert and oriented, his mood euthymic, his functional status intact, his affect appropriate, and he was interactive, the examiner noting that his progress was "maintained" (Tr. 261);[16] (12) on September 19, 2017, Dennison was oriented and alert, his mood anxious, his functional status intact, his affect appropriate and he was interactive, the examiner noting that his progress was "maintained" (Tr. 260); and (13) on October 17, 2017, the claimant was alert and oriented, his mood euthymic, his functional status intact, his affect appropriate, and he was interactive, the examiner noting that his progress was "maintained" (Tr. 259).[17]

The ALJ accorded partial weight to Dr. Davis' opinions and little weight Wood's opinions. (Tr. 20-21.)

> As for the opinion evidence, John Davis, Ph.D., a psychological consultative examiner, opined in May 2015 that the claimant could perform simple tasks well and complex tasks poorly. The examiner also opined that his ability to interact with the public, coworkers, and supervisors is poor, and he opined that his ability to respond to changes in the work environment is poor. This opinion is given partial weight, only to the extent it is consistent with moderate functional limitation as described in the residual functional capacity. The opinion is somewhat vague and not adequately supported with explanation or clinical evidence to support greater than moderate limitation. Regardless, the opinion is consistent with the claimant's shyness, feelings of detachment from the environment, and anxious and depressed moods.
>
> Robin Wood, M.S., the claimant's counselor, opined in October 2017 that the claimant had mostly moderate and marked limitations. This opinion is given little weight because it is not supported by an adequate explanation or pertinent clinical evidence. Ms. Wood notes a psychological evaluation was not obtained. She notes the claimant has difficulty in social situations. He is so polite that it masks his abilities initially. She does not believe he could sustain it for a lengthy period. The opinion is speculative and

---

[16]    Wood's notes document Dennison's continued desire for a job. (*Id.*)

[17]    "Happy to be here and he had a lot he needed to share. He had a form from the attorney and I will get that to her this week." (*Id.*)

inconsistent with the claimant's normal concentration, ability to perform serial seven calculations, and ability to write a book.

(*Id.* (internal citations omitted)).

The Court begins its analysis by observing that the ALJ's findings that Dr. Davis' and Counselor Wood's opinions are not supported by clinical evidence or by adequate explanation (Tr. 20-21), if accurate, constitute valid reasons for failing to accord those opinions the partial or little weigh afforded them. *Cf. Gilabert, supra,* 396 Fed.Appx. at 655 (recognizing that good cause for rejecting a treating physician's opinion include that the opinion is conclusory and inconsistent with the doctor's own medical records, the opinion is not bolstered by the evidence, and that the evidence supports a contrary finding).[18] In this case, the undersigned disagrees with Plaintiff's view of the evidence and finds that the ALJ's decision to accord Dr. Davis' medical opinions only partial weight and Counselor Wood's opinions little weight is supported by substantial evidence of record.

Turning first to Dr. Davis, the ALJ "accepted" the examiner's opinion that Dennison's "ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions is good." (Tr. 251; *compare id. with* Tr. 20-21.) Indeed, even Counselor Wood indicated that Dennison would have no problems with performing simple tasks and with understanding, carrying out and remembering instructions. (*See id.* at 279 & 280.) Where the ALJ "partially" diverged with Dr. Davis was with respect to the consultative examiner's opinion that Dennison's "ability

---

[18]     The Court construes the ALJ's statements that the opinions of Dr. Davis and Counselor Woods are not supported by adequate explanation and clinical evidence to simply be another way of saying that their opinions (or most of them) are conclusory and inconsistent with the providers' own records.

(Continued)

to interact appropriately with the public, interact appropriately with supervisors and co-workers[,] and to respond appropriately to usual work situations and to changes in [a] routine setting is poor." (Tr. 251; *compare id. with* Tr. 20-21 (rejecting this opinion)).[19] And that the ALJ's divergence with Dr. Davis is only "partial" is clear inasmuch as the ALJ's RFC determination that Plaintiff have no direct interaction with the public (Tr. 19) is consistent with Dr. Davis' opinion that Dennison's ability to interact appropriately with the public is poor. In addition, the ALJ recognized that Plaintiff would also be "limited" in his ability to interact with supervisors and coworkers and in responding to changes in a routine work setting (Tr. 19), but not as limited as indicated by Dr. Davis (*compare id. with* Tr. 251).

This Court agrees with the ALJ that Dr. Davis' clinical observations and findings do not support the examiner's opinions that Dennison would have a "poor" ability to respond appropriately to changes a routine work setting and a "poor" ability to interact appropriately with supervisors and coworkers. In particular, one-time examiner Dr. Davis specifically observed that Dennison satisfactorily interacted with him and his staff (Tr. 248), demonstrated no abnormalities interfering with the ability to communicate or deficits in his overall concentration and attention (*id.*), cooperated with the examiner on intelligence testing, and, indeed, appeared "friendly as well as comfortable in the test setting." (Tr. 250.)  Accordingly, the undersigned discerns no error in the ALJ's decision to give Dr. Davis' opinion only partial weight vis-à-vis limitations with respect to changes

---

[19]     The ALJ simply made note of Dr. Davis' opinion that Dennison's ability to perform complex tasks is poor (Tr. 20; *compare id. with* Tr. 251) and was required to do no more than that inasmuch as her RFC determination that Plaintiff "can perform simple, routine tasks in 2-hour increments with normal breaks for the duration of an 8-hour workday[]" (Tr. 19) obviously took this opinion into consideration.

in a routine work setting and interacting appropriately with supervisors and coworkers, *see Gilabert, supra,* 396 Fed.Appx. at 655, and, instead, giving greater weight to the RFC findings of non-examiner Dr. Arnold Mindingall, who copiously reviewed Dr. Davis' report and determined that Dennison's contact with supervisors and coworkers should be casual, informal and not prolonged and that changes in work routine should be infrequent and presented gradually (Tr. 64-65; *compare id. with* Tr. 21).

With respect Counselor Robin Wood, the ALJ gave little weight to her October 17, 2017 mental residual functional capacity assessment (*compare* Tr. 21 *with* Tr. 279-80). And while, as observed above, some of Counselor Wood's own "limitation" findings are entirely consistent with the ALJ's RFC determination (*compare id. with* Tr. 19), the undersigned discerns no error with respect to the ALJ's affording only "little" weight to Wood's opinions. For instance, the Court agrees with the ALJ that Wood's comment on the questionnaire that Dennison could not, essentially, sustain the ability to work (*see* Tr. 280) is "speculative" and also "inconsistent with the claimant's normal concentration, ability to perform serial seven calculations, and ability to write a book[.]" (Tr. 21.) Moreover, the ALJ is absolutely correct that Counselor Wood's mental RFC findings are not supported by any clinical evidence, either her own or the evidence from Dr. Davis. (*See* Tr. 21.) Wood's psychotherapy notes reflect that Dennison's therapy was "progressing" (*compare, e.g.,* Tr. 263-67 *with* Tr. 259-62) and, indeed, on the date Wood completed the questionnaire, she had a session with Plaintiff for which he was happy to appear and had a lot to share, presented as oriented and alert, with an appropriate affect

and euthymic mood,[20] and with his functional status intact (*id.* at 259). In fact, other that an initial therapy finding of flat affect (Tr. 275), a relatively early therapy finding of "variably impaired" functional status (Tr. 269), and consistent findings in the early months of therapy of anxious and/or depressed mood ((*see* Tr. 268-72), Counselor Wood's objective clinical findings were essentially normal beginning in August and running through October 17, 2017 (*see* Tr. 259-67), the date upon which Wood indicated that Plaintiff is too impaired to work (*see* Tr. 279-80). Thus, Wood's own clinical findings are inapposite to her mental RFC findings/limitations/opinions as are the objective findings of Dr. Davis, inclusive of the one-time examiner's findings Dennison had no abnormalities that would interfere with communication, no indications of deficits in overall concentration or attention, no unusual mannerisms, and the ability to satisfactorily interact with Dr. Davis and his staff (even though he had never interacted with them before the date of the evaluation) (*see* Tr. 248 & 250).[21] Accordingly, the undersigned finds that the ALJ committed no reversible error with respect to her analysis of Counselor Wood's mental RFC findings/limitations/opinions.

---

[20] Euthymic is defined, as follows: "pertaining to a normal mood in which the range of emotions is neither depressed or highly elevated." http://medical-dictionary.thefreedictionary.com/euthymic (last visited, July 15, 2019, 11:05 a.m.).

[21] In addition, the manner in which Counselor Wood completed the mental RFC questionnaire is inherently inconsistent because in the first portion of the questionnaire Wood "circles" on the form that Dennison has a "marked" impairment with respect to interacting with others (Tr. 279) but in the second portion of the questionnaire merely "circles" that Plaintiff is "moderately" limited in his abilities to respond appropriately to supervision and coworkers (Tr. 280). In addition, Wood wholly speculates that Dennison would be "expected" to have repeated (that is, at least 3) episodes of decompensation in work or work-like settings which would cause him to withdraw from that situation or experience exacerbation of signs or symptoms for a period lasting at least 2 weeks (*see id.* at 279), as the record reflects no episodes of decompensation (*see generally* Tr. 30-280). Indeed, the record reflects that Dennison was successful in his only work attempt. (*Compare* Tr. 38 *with* Tr. 161-63 & 168).

In light of the foregoing, the Court finds that good cause existed for the ALJ to afford only partial weight to the opinions voiced by Dr. Davis on May 19, 2015 and little weight to Counselor Wood's mental RFC findings/limitations/opinions. *Cf., e.g., Hunter v. Social Sec. Admin., Commissioner,* 808 F.3d 818, 823 (11th Cir. 2015) ("We will not second guess the ALJ about the weight the treating physician's opinion deserves so long as he articulates a specific justification for it."), *cert. denied,* 136 S.Ct. 2487, 195 L.Ed.2d 823 (2016), *with Gilabert, supra,* 396 Fed.Appx. at 655 (recognizing that good cause exists to reject even a treating physician's opinions/findings where those findings/opinions are conclusory or inconsistent with the doctor's own medical records). Finally, any suggestion by Plaintiff that the ALJ improperly "cherry-picked" from the medical evidence to develop an RFC assessment and, in doing so, improperly substituted her own opinion for that of Dr. Davis and Counselor Wood, is belied by the record, a record which establishes good cause for the weight ("partial") the ALJ assigned to Dr. Davis' opinions regarding Dennison's abilities to interact with supervisors and coworkers and to respond to changes in a routine work setting and the weight ("little") afforded Counselor Wood's mental RFC findings/limitations/opinions, while at the same time supplying substantial evidence to support the ALJ's RFC determination[22]. Stated somewhat differently, this

---

[22] This substantial support comes largely in the form of the minimal objective findings contained in Dr. Davis' evaluation (*see* Tr. 247-51) and Counselor Wood's psychotherapy progress notes (Tr. 259-76), as well as the report on the reviewing physician (*see* Tr. 59-65), as previously set forth herein and as summarized by the ALJ (*see* Tr. 20), which the ALJ linked to her RFC assessment (*see id.* (after summarizing Dr. Davis' consultative examination and Wood's psychotherapy sessions, the ALJ noted that her "residual functional capacity [assessment] accounts for his mental impairments with the limitation to simple, routine tasks, occasional changes in the work setting, and limitations regarding social interaction.")). Moreover, Dennison expressed to Counselor Wood on several occasions his desire to work/find a job (*see* Tr. 261 & 271), indicated during the administrative hearing that he thought he could work where he did not have to interact with the public but only with a few coworkers (Tr. 46), and, as well, testified that (Continued)

Court finds that "the ALJ did not 'play doctor' in assessing [Plaintiff's] RFC, but instead properly carried out h[er] regulatory role as an adjudicator responsible for assessing [Plaintiff's] RFC." *Castle v. Colvin,* 557 Fed.Appx. 849, 853 (11th Cir. Feb. 18, 2014) (citation omitted).

Given that Dennison's overarching assignment of error is properly overruled and Plaintiff does not challenge the VE's identification of medium and light jobs an individual with the residual functional capacity reflected in the decision can perform (*compare* Doc. 10 *with* Tr. 19, 22 & 50-51), the Commissioner's fifth-step determination is due to be affirmed. *See, e.g., Owens v. Commissioner of Social Security,* 508 Fed.Appx. 881, 883 (11th Cir. Jan. 28, 2013) ("The final step asks whether there are significant numbers of jobs in the national economy that the claimant can perform, given h[er] RFC, age, education, and work experience. The Commissioner bears the burden at step five to show the existence of such jobs . . . [and one] avenue[] by which the ALJ may determine [that] a claimant has the ability to adjust to other work in the national economy . . . [is] by the use of a VE[.]"(internal citations omitted)); *Land v. Commissioner of Social Security,* 494 Fed.Appx. 47, 50 (11th Cir. Oct. 26, 2012) ("At step five . . . 'the burden shifts to the Commissioner to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.' The ALJ may rely solely on the testimony of a VE to meet this burden."

---

he had finished writing one book and was working on a book series (Tr. 36; *compare id. with* Tr. 182 (mother indicates that Plaintiff's hobbies and interests include reading and writing, which he does daily and "very well")).

(internal citations omitted)). In short, substantial evidence supports the ALJ's

determination that Dennison is not disabled.

## **CONCLUSION**

It is **ORDERED** that the decision of the Commissioner of Social Security denying

Plaintiff benefits be affirmed.

**DONE** and **ORDERED** this 31st day of July, 2019.

s/P. Bradley Murray
**UNITED STATES MAGISTRATE JUDGE**